Margaret D. Van Schaack appeals from an order entered on final settlement of the estate of her mother, Annie Hargrove Donald, who died testate November 12, 1979. We affirm in part, reverse in part, and remand.
Annie Hargrove Donald executed her last will and testament on June 22, 1979. In it, she appointed the First National Bank of Birmingham (now AmSouth Bank, N.A., and hereinafter referred to as "the Bank") as the executor of her estate. Mrs. Donald was survived by her three adult children: Anne Shannonhouse, Robert Glenn Donald, and the appellant, Margaret Van Schaack.[1] In her will, Mrs. Donald bequeathed all of her personal property to her three children equally. She also created a residual trust to benefit her three children, and the Bank was designated as trustee. The pertinent terms of the will creating the residual trust are as follows: *Page 742 
 "ITEM THREE: All of the rest, residue and remainder of my property, of whatever kind and character and wherever situated (excluding any property over which I have only a general or limited power of appointment exercisable by will, deed or otherwise), I give, devise and bequeath to my trustee, who shall hold the same in trust for the uses and purposes as hereinafter provided:
 "(a) The trustee shall apportion the trust so that there will be one share for each child of mine then living and one share for the then living descendants of each deceased child of mine. The said shares shall be equal except that the share allocated to my daughter, Margaret Caldwell Donald von Schaack, or her descendants, shall be of a value $50,000.00 less than the value of each of the other shares allocated to my remaining children or their descendants.
 "If the share allocated to my daughter, Margaret Caldwell Donald von Schaack, or her descendants shall be determined to be of a value of zero or less than zero, then my said daughter or her descendants shall take no part of my estate.
 "(b) The trustee shall hold the share allocated to any child of mine for the benefit of such child for and during his or her lifetime.
". . .
 "ITEM FOUR: The Trustee shall hold and manage the said trust or trusts and all shares thereof, with all of the powers and authority Trustee would have if Trustee was the absolute owner thereof, including but not limited to the following powers:
". . .
 "22. To divide or distribute the trust property as provided for hereunder in cash or in kind, or partly in each, and for such purposes, to determine the value of the trust property, and to determine the share and identity of persons entitled to take hereunder." (Emphasis added.)
Shortly after her death, Mrs. Donald's will was admitted to probate, and, because of a will contest that the appellant filed but subsequently dismissed, the probate of the estate was removed to circuit court. At the time of her death, Annie Hargrove Donald's gross estate was valued for federal estate tax purposes at $643,000 and included four parcels of real property. During the administration of the estate, three of the parcels were sold by the Bank for payment of estate taxes and administration expenses. The remaining real property, hereinafter referred to as the "Burroughs Building," was appraised for federal estate tax purposes at $335,000 as of the date of the testatrix's death.
During the pendency of the above-mentioned will contest, the Bank sought instructions from the trial court on the proper distribution of the income generated by the trust estate prior to a final settlement of the estate. The trial court entered an order directing that $1,000 per month be paid to each of the testatrix's children during the pendency of the will contest. That amount ended up being less than the total income that had been generated by the trust estate prior to the Bank's petition for final settlement, so that on March 16, 1984, when the Bank calculated the respective shares of the children, the residual trust estate consisted not only of the Burroughs Building but also $68,166 in accrued and undistributed income. The Bank retained $25,000 of the undistributed income for future administrative fees and expenses, leaving the remaining income and property to be distributed according to the terms of the testamentary trust created in the residual clause of the testatrix's will.
Pursuant to its interpretation of those terms, the Bank added the remaining cash, $43,166, to the 1979 appraised value of the Burroughs Building for a combined figure of $378,166 with which to fund the residual trust. The Bank then proceeded to divide this amount among the three "equal" residual shares. However, because the will also provided that appellant's share was to be "of a value $50,000 less than the value of each of the other [two] shares," the Bank deducted $100,000 from the combined figure, leaving a balance of $278,166. The Bank then divided this figure by three to arrive at a per share value of $92,722; *Page 743 
$50,000 was then added to the value of the shares of Robert Donald and Anne Shannonhouse, giving each a value of $142,722. The value of appellant's share remained $92,722. The respective share values were then divided into the original combined figure of $378,166 to arrive at a percentage value for each share:
 (1) Anne Shannonhouse $142,722 37.75%
 (2) Robert Glenn Donald $142,722 37.75%
 (3) Margaret Van Schaack $ 92,722 24.50%
 TOTAL: $378,166 100.00%

These percentages represented each share's proportionate ownership of the property in the residual estate (i.e., the remaining cash, the Burroughs Building, and its rental income). Following the division of the residual estate into three shares on March 16, 1984, the income that was generated thereafter was distributed to each of the testatrix's three children in the percentages shown above.
On April 14, 1986, the Bank filed its petition for final settlement of the estate, wherein it sought an award of attorney fees and executor's fees and expenses, claiming the following:
 "[The Bank has] performed extraordinary services in the administration of the estate, including successfully defending the will in a will contest filed by Margaret D. Van Schaack, in successfully defending the Estate against a disputed claim filed by Margaret D. Van Schaack, in intervening in certain litigation involving a garnishment against the share of Margaret D. Van Schaack, and other extraordinary services. In addition, your Petitioner was obligated to seek court approval of many of its actions as Executor during the pendency of the will contest, due to the fact that the powers enumerated under the will were suspended until the will contest was successfully concluded."
Thereafter, the trial court entered an order appointing an attorney as guardian ad litem "to represent the interests of the descendants of Robert Glenn Donald, Margaret Caldwell Donald van Schaack and Anne Donald Shannonhouse." A hearing was scheduled for May 23, 1986, and notice of the Bank's petition for final settlement and the hearing date and time was published in the Alabama Messenger once a week for three consecutive weeks. A continuance was granted, and additional notice of the rescheduled hearing was given to the parties and by publication in the Alabama Messenger, as notice had been given previously.
A hearing on the petition for final settlement of the estate was held July 21, 1986. Thereafter, on August 29, 1986, another hearing was held for the purpose of ascertaining certain attorney fees and for any other business necessary to be considered by the court before final determination and closure of the estate. In its order dated October 31, 1986, the trial court decreed that the valuations and computations applied by the Bank were proper and declared the estate settled. The court also awarded the attorney for the estate a fee of $50,000 and the executor a fee of $30,000, finding that they had performed extraordinary services. In addition, the trial court awarded a fee of $5,000 to the guardian ad litem. A trial judge different from the one who had heard the case denied appellant's post-judgment motion to set aside the Bank's property assessment and division, to set aside or reduce the fees of the attorney, executor, and guardian ad litem, and to make findings of fact pursuant to Rule 52, A.R.Civ.P. This appeal followed.
 I.
The first issue appellant raises concerns the propriety of the Bank's valuation of the property contained in the residual estate for purposes of satisfying the pecuniary bequest and the fractional shares of the residual trust estate. Specifically, appellant contends that the Bank should have valued the Burroughs Building, the principal asset of the trust, as of the date of distribution in 1984, rather than as of the testatrix's death in 1979. Appellant contends that the value of the building had greatly appreciated between the date of death in 1979 and the date of distribution in 1984. The appellant maintains that, contrary to the Bank's interpretation, the terms of the trust do not call for a simple fractional sharedivision of the residual *Page 744 
estate; rather, the appellant contends, the trust requires the Bank to make a $50,000 pecuniary adjustment against the value of the appellant's fractional share and in favor of each of the other two shares. Thus, the appellant argues that, in view of the pecuniary aspect of this otherwise fractional share bequest, the respective share values should have been calculated by using the date of distribution values of the assets in the residual estate, since there was insufficient cash in the residual estate to satisfy the pecuniary bequest.
The Bank is correct in answering that it is proper to use date of death values of assets when satisfying purelyfractional share bequests. The obvious reason for this is that any appreciation or depreciation in the assets occurring between the testatrix's death and the distribution is shared by the beneficiaries in direct proportion to their respective fractional interests. The Bank determined that the residual bequest in this case is a fractional bequest, and in its brief states that "a pecuniary bequest is a general bequest, while a fractional bequest is a residual bequest," citing Douglas, "Federal Taxation: Formula Clause Marital Deduction Gifts," 40 Tul.L.Rev. 601 at 605 (1966). We note, however, that Mr. Douglas's article does not stand for the proposition that there can never be a pecuniary bequest contained within a residuary clause; that is, a pecuniary bequest intended to be satisfied solely with the assets of the residuary estate. Without question, the bequest used in Mr. Douglas's article to illustrate the "pecuniary share formula" is not a residual pecuniary bequest:
 "The pecuniary share formula is commonly expressed in terms of `an amount equal to' one-half of the adjusted gross estate, less the value of assets qualifying for the marital deduction and passing to the wife under the provisions of the will or outside the will. A bequest in this form is general rather than specific, and produces a gift of a dollar amount equal to the maximum marital deduction. The precise amount, of course, will not be known until estate properties have been valued for estate tax purposes. This type of bequest is not a residuary gift, but rather is satisfied out of the estate's assets prior to distribution of the residue. In this respect the pecuniary share formula is a departure from the traditional practice of providing for the principal objects of the testator's bounty in the residuary clause." (Emphasis added.)
However, the bequest in the present case clearly is not just a fractional share bequest; rather it is a hybrid between a pecuniary bequest and a fractional share bequest. While the terms of the trust call for an equal fractional share division of the residual estate, it also calls for a pecuniary, fixed-sum adjustment in favor of appellant's siblings. Indeed, Kathryn Miree, vice president and trust officer of the Bank, testified at trial that "[t]he $50,000 is a pecuniary adjustment to the fractional shares." Because at the time of distribution the residual estate did not contain sufficient cash or liquid assets with which to satisfy the $50,000 pecuniary bequest in favor of each of appellant's siblings, and the Bank elected to fund the residual bequest primarily in kind(i.e., the Bank elected not to sell the Burroughs Building), the Bank was required to arrive at a formula by which it "adjusted" the value of the residual shares so that the value of the appellant's share would be $50,000 less than each of the other two shares. The method it used to accomplish this result is described hereinabove. Before the Bank could calculate the value of each share, and thereby determine each beneficiary's percentage share ownership in the building and its income, the Bank had to make this $100,000 pecuniary adjustment in favor of the appellant's siblings' shares.
The Bank concedes that, in satisfying a pecuniary fixed sum bequest, it would use the date of distribution value of the assets it used to satisfy such a bequest. At trial, Ms. Miree further testified in part as follows:
 "With a pecuniary share we would look at the value of the assets and the directions in the will as of the date of death and determine a specific dollar value *Page 745 
for that pecuniary share. Then at the time of funding, we would fund those trusts with exactly that dollar value. We would value the assets as of the date of funding, but we would distribute exactly that dollar funding to the share." (Emphasis added.)
Of course, under the terms of the present will, the Bank did not have to determine the specific dollar value of the pecuniary share in favor of appellant's siblings, because that specific dollar value ($50,000 for each share except appellant's share) was expressly stated therein. Nevertheless, it is apparent that because the Bank did not have sufficient cash to fund this pecuniary bequest, it, in fact, funded, or satisfied it, with assets valued as of the date of the testatrix's death, contrary to the very rule it recognizes. Ms. Miree further testified:
 "A. . . . On [these] fractional share[s], . . . I derived the fraction by [first] making a pecuniary adjustment, and I again applied that fractional share to the market value at the time of distribution, which for personal property was in March 1984 and for real property, it was at the date of death when it vested in the remainderment.
 "Q. You're saying that you satisfied this $50,000 pecuniary adjustment with date of death values?
 "A. I'm saying that I derived a fraction based on that pecuniary adjustment, based on the estate tax or date of death values and later applied that fraction to the assets at the time of distribution.
". . .
 "A. March 1984 was the date that the trusts were physically set up on our books.
 "Q. Is that the date on which you made this $50,000 adjustment?
 "A. No. The $50,000 adjustment was made when I determined the shares as of the date of death. I used the $50,000 adjustment to derive the fractional shares as of the date of death. At the date of distribution I simply applied that fraction to the assets.
". . .
 "Q. How was the building distributed as of the date of death when actually you did not make the distribution until '84, 1984?
 "A. The title to the building, the title to the real property under the Probate Code prior to 1983 vests the property immediately in the heirs at law or the devisees under the will. And that is the — the property never vests in the hands of the executor. So even though on our books we showed the allocation at a later date, the transfer took place and the distribution took place as of the date of death. For the real property only.[2]
 "Q. And so this $50,000 adjustment, to each of the other two shares was done later and made retroactive to the date of death in computing the percentages?
 "A. No, the percentages were computed as of the date of death. The $50,000 differential was computed and the fractions derived as of the date of death at the time that the will spoke to those percentages. And those percentages were simply applied at the time that I —
"Q. Are you saying that you —
"A. — showed the —
 "Q. — made the $50,000 adjustment as of the date of death or on the date of death?
 "A. We used the values as of the date of death to determine the fractional interest that each of the beneficiaries had and then applied those fractions to the property available for distribution in March of 1984.
 "Q. Well, is it not correct that in March of 1984 there was a $50,000 adjustment to each of these two shares that *Page 746 
had to be made? In March of '84 in the administration of the estate of the will, you were at that time, implementing the terms of the will which provided for each of the other two shares, other than Mrs. Van Schaack's share, to be $50,000 in value greater than Mrs. Van Schaack's share?
 "A. Again I would say that that adjustment was derived as of the date of death based on the date of death values and applied at the time that those trusts were established.
 "Q. Was there not a pecuniary adjustment that was required?
 "A. It was fractional funding. The pecuniary adjustment was made to derive the fractions for funding.
 "Q. You had a pecuniary adjustment that needed to be made —
"A. That's correct.
"Q. — is that correct?
"A. To derive the fractions.
 "Q. And I think your pecuniary adjustment — now, is not a pecuniary adjustment in the nature of a specific cash adjustment or value adjustment? Isn't that the nature of pecuniary adjustment? Did you do it in terms of a dollar amount?
 "A. Yes. That pecuniary adjustment was made in order to derive the fractions of the whole at the date of death values. We had to derive the fractions for funding. And the way to derive the fractions was to make that pecuniary adjustment against the 38 — $378,166 available.
 "Q. In effect this was really a retroactive adjustment; is that correct?
 "A. The values we used were the date of death values to derive the fractions. In this instance there were no — for example, stocks and bonds. Had we had in addition to these assets $100,000 worth of stocks and bonds, we would have looked back to the date of death value to derive the fraction. We would have then valued all the assets as to the date of distribution so that the stocks and bonds, being personal property, would have received a current market value and the fractions derived from the date of death figures would have been applied to the current market figures for the date of death distribution so that the real property would have a date of death value; the cash would have a date of distribution value, and the stocks and bonds would have a date of distribution value.
 "Q. Are you saying that because the adjustment was made with the real estate that you used date of death values? Whereas, if the adjustment had been made with stocks and bonds, you would have used the date of distribution value?
 "A. I'm saying in each instance I used a date of distribution value. The date of distribution of the real property was the date of death at the time that the title vested in the trustees. The value at the date of distribution of the cash was its value at the date of distribution.
". . .
 "Q. If you ever had excess principal cash, you presumably would use that cash to make the distribution? Is that correct? The $50,000 —
 "A. We could have used that. The will gave us the power to distribute in cash or kind.
 "Q. And in that case then, the property would have vested in equal one-third shares, this building would have vested in equal one-third shares of the three trusts? If you had had cash?
 "A. If we had had cash and could have gotten the agreement of the beneficiaries, I think that the law provides that you can make that sort of distribution, yes.
 "Q. Well, are you saying, though, that it would have vested in equal one-third shares, because you're
 saying its vested in these percentages because you didn't have cash though? If you would have the cash on hand, would the property then have vested in equal one-third shares?
 "A. I assume that it would if we could have gotten the agreement of the beneficiaries. We —
 "Q. Did you have the agreement of the beneficiaries that had vested in these percentages? *Page 747 
 "A. We had no option here. We simply took the set percentages of each asset, the cash and the buildings. We didn't have any luxury for —
 "Q. Obviously, the effect of this adjustment was to cost Mrs. Van Schaack a percent interest of the building, which certainly had appreciated. Wouldn't one option have been to allow her perhaps to somehow contribute or buy her interest in cash so that she could have an equal one-third in the building?
". . . .
 "A. I'm not aware that the will gave me any option in that regard at all. It simply directed me to take the residuary and distribute it in those shares.
 "Q. Well, the will would have given you the option, would it not, if cash had been on hand, $100,000 cash, you would have had that option?
 "A. I think that that's correct if we would have funded the trusts appropriately using the cash available, and we had enough to fund for all the principal requirements of the building." (Emphasis added.)
We recapitulate what the Bank did in this case: In the first part of its calculation, the Bank subtracted $100,000, a fixed sum, from the value of the combined assets of the residual trust, which included some cash and the date of death value of the Burroughs Building. It then divided the remaining value of the residual estate into three to arrive at an equal per share value. However, when the Bank then added $50,000 to the value of each of appellant's sibling's shares, it had thereby "funded" or "satisfied" the pecuniary bequest to appellant's siblings primarily with assets valued as of the testatrix's date of death. Because setting off the $50,000 pecuniary bequests in favor of the appellant's siblings is of necessity the first step in the calculation of the value of the respective fractional shares, then, in the absence of clear contrary expression in the will, the Bank should have used the date of distribution value of the residual estate assets.
It is well settled that it is the intent of the testatrix, as ascertained from the language of the entire instrument, that governs the distribution of assets under a trust. FirstNational Bank of Birmingham v. Currie, 380 So.2d 283 (Ala. 1980); Wheeler v. First Alabama Bank of Birmingham,364 So.2d 1190 (Ala. 1978). This rule includes the intent of the testatrix with respect to the date the trustee shall use for valuing the assets used to satisfy a testamentary bequest in trust. In re Estate of Naulin, 56 Wis.2d 100, 201 N.W.2d 599
(1972); In re Ginn's Estate, 49 N.Y.S.2d 443 (N.Y.Sur. 1944). In many cases, there is no clear expression, and the language used for ascertaining the date of valuation intended by the testatrix is that which provides or describes the particular bequest at issue. From that language, it is determined whether the bequest is pecuniary or purely fractional. And on that basis, the appropriate date of valuation of the assets is determined. In re Will of Davidson, 55 A.D.2d 1012,391 N.Y.S.2d 232 (1977); In re Estate of Gutwirth, 53. Misc.2d 699,279 N.Y.S.2d 899 (N.Y.Sur. 1967); Brock v. House,318 S.W.2d 409 (Ky. 1958). The bequest at issue in this case partakes of both; however, we can find nothing in the language of this will that in any way, expressly or impliedly, indicates which date (date of death or date of distribution) the testatrix intended the trustee to use in valuing the property for the purposes of calculating the values of the respective shares of the residuary trust.
In its brief, the Bank argues that in this case we should apply the rule of construction that "[a] will speaks as of the date of testator's death, and will be construed as operating according to the then existing conditions unless a contrary intent is shown [citations omitted], and the language of a will, in the absence of a manifest intention to the contrary, speaks as of the testator's death." Jeffries v. Boyd, 269 Ala. 177,179, 112 So.2d 210 (1959). The Bank reasons that because the testatrix's will is dated June 22, 1979, and she died five months later on November 12, 1979, that in drafting the residual $50,000 pecuniary bequest to each of appellant's siblings, "there could be little doubt that the testatrix *Page 748 
was thinking in terms of 1979 dollars and the effect such a diminishment would have on the value of her estate at that time." This argument overlooks the fact that, in the paragraph immediately following the one containing the pecuniary bequest, the testatrix directed that "[i]f the share allocated to my daughter, Margaret Caldwell Donald von Schaack, or her descendants shall be determined to be of a value of zero orless than zero, then my said daughter or her descendants shall take no part of my estate." (Emphasis added.) This language clearly indicates a recognition on the part of the testatrix that, for purposes of satisfying the terms of her will, her estate would be valued at a date subsequent to the execution of her will (i.e., after her death), and, therefore, there remained the possibility that, prior to her death, she would dispose of some or all of her realty, or that the realty she died seized of would decline in value to the extent that the trustee could not satisfy the residual pecuniary bequests and
provide a residual share of any value to the appellant. And, while this language does indicate that the testatrix intended that her residual estate be valued subsequent to her death, it does not indicate whether she intended the date of valuation to be the date of her death or the date the trustee Bank actually distributed the shares under the terms of the residual trust. Accordingly, we find no merit in the Bank's argument that the date of death values should apply because "the testatrix was thinking in terms of 1979 dollars."
The parties have not cited to us, nor have we ourselves found, any factually similar cases in which an executor or trustee sought to satisfy a "hybrid" bequest, such as the one presented here (i.e., pecuniary bequests over purely fractional shares), with assets which are alleged to have appreciated between the date of death and the date of distribution. Nevertheless, we find the rule as stated in the case of Will ofMaglin, 85 Misc.2d 225, 379 N.Y.S.2d 213, 215 (N.Y.Sur. 1975), to be a sound rule to apply in the present case: "In theabsence of any expressed directions to the contrary, assets areto be valued as of the date of distribution." (Emphasis added.) This rule of construction should be applied regardless of whether the assets have appreciated or depreciated in value, and regardless of whether the valuation to be used is for the purpose of calculating the amount of a pecuniary bequest
expressed in terms of a fraction (e.g., "I bequeath an amount equal to one-half of my residual estate"), or for the purpose of calculating the value of a purely fractional share bequest(e.g., "I bequeath one-third of all my property, both real and personal"). As the Bank correctly notes, either type of bequest is to be satisfied with assets valued as of the date of distribution. See Restatement (Second) of Trusts § 347, comment h (1959): "In distributing the trust property in kind, the trustee must make the division in accordance with the fair market value of the property at the time of distribution." Therefore, unless a contrary intent can be ascertained from the trust instrument, it is reasonable to require the trustee to also determine the amount or size of the particular bequests based on the date-of-distribution values of the assets used to satisfy those bequests. Compare Pastan v. Pastan,378 Mass. 148, 390 N.E.2d 253, 256 (1979), where the testamentary trust contained the following pertinent language:
 "`In the administration . . . of the Trusts established under this Will, the Executors . . . shall have the following powers: J. . . . to make any division or distribution required under the terms of this will in kind or in money, . . . and to that end to allot to any part or share such stock, securities or other property, real or personal, as to them seems proper in their absolute judgment, and their judgment as to the value of such stock, securities, or other property so allocated shall be conclusive on all parties. . . .'"
Construing this language as it concerned the trustee's power to value the property for purposes of funding a trust so as to qualify for the marital deduction, the Supreme Judicial Court of Massachusetts stated:
 "This language, it could be argued, comprehends a power to distribute, assets to *Page 749 
the share No. 1 trust, upon its founding, at their value established for estate tax purposes, despite a decline in value by the date of the distribution.
 "But two principles of interpretation or of trust administration impinge on the language: First, in allocating assets in kind, a fiduciary as a general rule is to take them at their values as at the time of distribution and ordinarily at their then market values. See Boston Safe Deposit Trust Co. v. Stone, 348 Mass. 345, 350, 203 N.E.2d 547 (1965); Restatement (Second) of Trusts § 347, Comment h (1959); 4 A. Scott, Trusts §§ 347, 347.6-347.7 (3d ed. 1967). Second, despite wording in a dispositive instrument which seemingly empowers the fiduciary to be fanciful or arbitrary in making valuations, he is held by the law to the exercise of an honest, objective judgment, which in practice will mean a reasonable judgment corresponding to reality, and in the case of traded-in properties will doubtless mean a judgment in terms of market values. [Citations omitted.]" (Emphasis added.)
Pastan, 390 So.2d at 256.
Accordingly, we reverse the judgment below approving the Bank's satisfaction of the residual pecuniary bequests and the subsequent fixing of the percentage values of the residual shares in the trust assets based on the date-of-death value of the primary residual trust asset, the Burroughs Building. We hold that, in satisfying the terms of the residual trust, the Bank must use the value of the building as of the date of distribution.
 II.
The second issue the appellant raises is whether the awards of $50,000 and $5,000 for the estate's attorney and the guardian ad litem, respectively, were excessive. It is undisputed that, pursuant to Code of 1975, § 43-2-682, and Rule 17 (d), A.R.Civ.P., the trial court had the authority to award a fee to the attorney for the executor of the estate and to appoint a guardian ad litem and award a reasonable fee to such guardian. Nor do any of the parties dispute that the criteria to be considered by the trial court in determining a reasonable attorney fee in Alabama are set forth in Peebles v. Miley,439 So.2d 137 (Ala. 1983).
In Peebles, this Court added five more criteria to the seven that had been enumerated in our cases. The complete list of criteria used in the estimation of the value of an attorney's services now includes the following: (1) the nature and value of the subject matter of the employment; (2) the learning, skill, and labor requisite to its proper discharge; (3) the time consumed; (4) the professional experience and reputation of the attorney; (5) the weight of his responsibilities; (6) the measure of success achieved; (7) the reasonable expenses incurred; (8) whether a fee is fixed or contingent; (9) the nature and length of a professional relationship; (10) the fee customarily charged in the locality for similar legal services; (11) the likelihood that a particular employment may preclude other employment; and (12) the time limitations imposed by the client or by the circumstances. Of course, not all of the criteria will be applicable. "Indeed, there would hardly ever be a case where the [determination] of attorney's fees brought into play every criterion." Graddick v. First Farmers Merchants National Bank of Troy, 453 So.2d 1305, 1311 (Ala. 1984).
While "[a]n award of attorney's fees is within the trial court's discretion, subject to correction only for an abuse of that discretion," Clement v. Merchants National Bank of Mobile,493 So.2d 1350, 1355 (Ala. 1986), nevertheless, this Court must be able to "discern from the record what factors the court considered in deciding the attorney's fees." (Emphasis added.)Lolley v. Citizens Bank, 494 So.2d 19, 20 (Ala. 1986).
In the present case, the trial court entered an order stating:
 "The Court finds that the Executor and the attorney for the estate have performed extraordinary services during the administration of the estate; that Thirty Thousand Dollars ($30,000.00) is a reasonable fee for AmSouth Bank, N.A., as Executor of the Estate of Annie Hargrove Donald; and that Fifty Thousand Dollars ($50,000.00) is a reasonable attorney's *Page 750 
fee for Douglas L. McWhorter, attorney for the estate. The Court further finds that Five Thousand Dollars ($5,000.00) is a reasonable fee for William Dowsing Davis, III, as Guardian ad Litem."
In its petition for final settlement, the Bank asserted that it and its attorney had
 "performed extraordinary services in the administration of the estate, including successfully defending the will in a will contest filed by Margaret D. Van Schaack, in successfully defending the Estate against a disputed claim filed by Margaret D. Van Schaack, in intervening in certain litigation involving a garnishment against the share of Margaret D. Van Schaack, and other extraordinary services. In addition, your Petitioner was obligated to seek court approval of many of its actions as Executor during the pendency of the will contest, due to the fact that the powers enumerated under the will were suspended until the will contest was successfully concluded."
Based on the performance of extraordinary services, the Bank sought for itself as executor "and its attorney such fees and awards as may appear fair and just with respect to their services and expenses in the administration of this estate."
At the hearing on the Bank's petition for final settlement of the estate, the attorney for the Bank testified, without contradiction by the appellant,[3] that he had extensive background and experience in the handling and legal representation of estates, that he had actively represented the Bank in the administration of this estate for over six years, compiling 536 hours of billable time, and that he had incurred other expenses associated with that representation.[4] While there was no direct testimony offered by the estate as to the customary hourly rate in the Birmingham area for similar legal services, there was testimony from an attorney from a nearby area (Bessemer), who is experienced in the area of wills and estate administration, to the effect that the executor's attorney's fee of $50,000 was reasonable in this case:
 "A. . . . In my judgment I think that considering what the bank did in this particular matter, the number of hearings . . . which they had to prepare for, the time spent that a fee of $30,000 would be fair and reasonable as an executor's commission.
 "Q. Based on those same factors then, please, sir, do you have an opinion as to what a reasonable attorney's fee would be in this case?
"A. Yes, I do.
"Q. And what is that?
 "A. I listened to your testimony as to the hours spent, I believe you testified you spent five hundred and thirty something hours. I listened to you as to the number of hearings. I think you testified [there] were in [excess] of twenty hearings.
 "Based on the time, the hearings, and the amount of work involved in this case, I think an attorney's fee of $50,000 would be adequate."
On this record, we cannot say that the trial court abused its discretion in awarding the executor's attorney a total fee of $50,000.
We cannot, however, reach the same conclusion with respect to the fee awarded the guardian ad litem. Our review of the record discloses no evidence regarding the services performed by the guardian ad litem other than his presence at the July 21, 1986, hearing on the Bank's petition for final settlement, at which he asked several questions of Kathryn Miree. However, there was no testimony offered at that hearing concerning the services the guardian ad litem had performed, nor does the trial court's order refer to the nature or character of the services performed by the guardian ad litem. We, therefore, vacate the judgment as to the guardian ad litem's fee and instruct that, on remand, an evidentiary hearing be held for the purpose of determining a reasonable guardian ad litem fee and an order prepared setting forth "with some particularity the findings from *Page 751 
the evidence adduced." Lolley v. Citizens Bank, 494 So.2d at 21. See also Clement v. Merchants National Bank of Mobile,supra.
 III.
The final issue appellant raises concerns the sufficiency of the trial court's appointment of only one guardian ad litem "to represent the interests of the descendants of Robert Glenn Donald, Margaret Caldwell Donald Van Schaack [appellant], and Anne Donald Shannonhouse," as remaindermen of these life tenants. The gravamen of appellant's argument is that the interest of her descendants conflicted with that of the other remaindermen because of the basis upon which the Bank computed the percentage values of each life tenant's share; and, therefore, appellant contends that the court erred in not appointing a separate guardian ad litem to represent the conflicting interests of appellant's descendants.
Because we have decided in appellant's favor on the issue of the computation of the shares, we deem this issue, as to the sufficiency of the guardian ad litem's representation of her descendants, to be moot. We, therefore, pretermit any further consideration of this issue.
Based on the foregoing, the judgment below is affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.
AFFIRMED IN PART, REVERSED IN PART, AND REMANDED WITH DIRECTIONS.
All the Justices concur.
[1] The appellant's name appears in the record both as "Van Schaack" and as "von Schaack."
[2] The Bank, as indicated by this testimony, presumes that the rule regarding the vesting of title to realty at the testatrix's death applies in this case, and, therefore, asserts that title to the Burroughs Building vested in the appellant and her siblings upon the death of their mother. This, of course, is not true. It is well settled that the legal title to property bequeathed or devised in trust vests in the trustee, and the Bank as trustee was vested with the title to the realty that fell into the testatrix's residual estate. See Code of 1975, § 35-4-251; 19 Ala. Digest, Trusts, Key No. 134.
[3] Counsel appearing on behalf of appellant, Margaret Van Schaack, did not offer evidence to refute the Bank's attorney's contentions with respect to the extent of the services rendered by him.
[4] The estate had already advanced the Bank's attorney $22,192.12 in fees and expenses, and the estate was thereby entitled to a credit for that amount against the total attorney's fee award of $50,000.