REL: December 22, 2022

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is printed in **Southern Reporter**.

# ALABAMA COURT OF CIVIL APPEALS

## OCTOBER TERM, 2022-2023

_____

**2210282**
_____

**John Lester**

**v.**

**Amber Lester**

**Appeal from Lee Circuit Court
(DR-10-39.07)**

EDWARDS, Judge.

In May 2019, Amber Lester ("the mother") filed a complaint in the Lee Circuit Court ("the trial court") seeking to have John Lester ("the father") held in contempt for his actions in April 2019 that allegedly

violated certain provisions of a 2018 judgment prohibiting the father from having direct or indirect contact or communication with, or being within 100 feet of, the mother's husband, Brian Manderson. The mother also sought an ex parte order restraining the father from attending the activities of the parties' children and requiring that the father's visitation with the children be supervised. The trial court entered an ex parte order suspending the father's visitation with the children and prohibiting contact between the father and Manderson, the mother, and the children; it also entered a protection-from-abuse order ("the PFA order"), which prohibited the father from being within 300 feet of the mother, the children, the mother and the children's residence, the mother's place of employment, and the children's school. The father filed a motion seeking reconsideration of the ex parte order and the PFA order, and the mother filed a motion seeking to have the father held in contempt for alleged actions occurring in October 2019 that the mother contended were in violation of the ex parte order and the PFA order. The trial court entered a pendente lite order in November 2019 that, among other things, required the father to commence an anger-management course. The

father later filed in this court a petition for the writ of mandamus relating to the ex parte order and the PFA order; we granted that petition in part and ordered the trial court to set aside the ex parte order and to hold an evidentiary hearing on the issue of visitation. Ex parte Lester, 297 So. 3d 477 (Ala. Civ. App. 2019).

Over the next year, the parties filed several motions, the father filed a counterclaim seeking a modification of custody and to hold the mother and Manderson in contempt for alleged violations of provisions in the 2018 judgment prohibiting the consuming of alcoholic beverages during the mother's custodial periods and Manderson's disciplining of the children, and the trial court held several hearings, including an evidentiary hearing in June 2020 that focused on the visitation issue. However, the trial court stayed the trial on the contempt allegations raised by the mother because the father had been arrested and charged with various crimes in Alabama and in Georgia stemming from the incidents giving rise to the contempt allegations. The trial court entered a pendente lite order in July 2020 awarding the father supervised visitation with the children on the second and fourth Saturdays of each

month from 10:00 a.m. to 5:00 p.m.; the order required visitation to be supervised by Christopher Statin.

Ultimately, although the father's criminal cases were not yet resolved and the father was exercising his Fifth Amendment privilege against self-incrimination regarding the incidents giving rise to the contempt allegations, the trial on the parties' claims commenced on December 10, 2020. On January 11, 2021, the trial court entered an order that, among other things, found the father to be in contempt based on his actions in April 2019 and in October 2019, assessed a $1,000 fine for each incident of contempt, and modified the visitation provisions of the judgment divorcing the parties, which had been entered in March 2010, and any subsequent judgment by awarding him unsupervised visitation with the children on the second and fourth Saturdays of each month between 9:00 a.m. and 6:00 p.m. The father filed a purported postjudgment motion seeking reconsideration of the January 2021 order. In that motion, among other things, the father challenged the assessment of $2,000 in fines, arguing that the trial court was limited to a $500 fine for each finding of what, he alleged, was criminal contempt.

4

In response to the father's purported postjudgment motion, the trial court entered an order on May 5, 2021, explaining that it had found the father to be in <u>civil</u> contempt and stating that, pursuant to <u>United States v. United Mineworkers of Am.</u>, 330 U.S. 258, 303-04 (1947), and <u>Chestang v. Chestang</u>, 769 So. 2d 294 (Ala. 2000), a trial court is permitted to assess fines in conjunction with a finding of civil contempt "to encourage a contemnor's future compliance with the court orders" and that, pursuant to <u>United Mine Workers</u>, <u>Chestang</u>, and <u>Pate v. Guy</u>, 934 So 2d 1070 (Ala. Civ. App. 2005), a trial court is permitted to award damages "in order to compensate the injured party and/or to encourage the contemnor's future compliance with court orders." The father filed a notice of appeal, which was assigned appeal number 2200734. However, because the trial court had not resolved the father's counterclaim in the January 2021 order, we dismissed appeal number 2200734 as having been taken from a nonfinal judgment. <u>Lester v. Lester</u> (No. 2200734, Sept. 21, 2021), ___ So. 3d ___ (Ala. Civ. App. 2021) (table).

After we issued our certificate of judgment in appeal number 2200734, the father filed a motion to finalize the January 2021 order.

5

2210282

After a hearing, the trial court entered a final judgment on November 23, 2021, finding the father in civil contempt based on the two incidents alleged by the mother, assessing what it described as a $1,000 civil fine for each incident of contempt, awarding the father unsupervised visitation with the children on the second and fourth Saturdays of each month from 9:00 a.m. to 6:00 p.m., ordering the father to pay the mother $8,000 to reimburse her for her attorney fees, and ordering the father to pay $3,700 toward the fee for the children's guardian ad litem. The November 2021 judgment denied all other requests for relief by either party and did not award the father any specific holiday or summer visitation. The father filed a timely notice of appeal.

The record contains transcripts of three evidentiary hearings: the November 2019 hearing on the father's request to set aside the ex parte order, the June 2020 hearing on the visitation issues, and the December 2020 trial. Most of the testimony at each of the evidentiary hearings centered on the incidents of contempt that the mother alleged had occurred in April 2019 and October 2019. The father exercised his Fifth

6

2210282

Amendment privilege against self-incrimination and did not testify about the circumstances surrounding his allegedly contemptuous behavior.

Manderson testified that, in April 2019, he took his youngest stepdaughter, M.L. ("the younger child"), to softball practice, where, he said, he observed the father in the parking lot at the softball-practice field. Manderson said that he dropped the younger child off and had informed her that he would be going to a nearby store. According to Manderson, he soon noticed that the father had followed him from the practice field. Manderson testified that the father had followed him to the store parking lot and that the father had initially parked an aisle away but, soon thereafter, moved into a nearby parking space. Manderson said that he had called the mother when he had noticed the father following him and that she had advised him to contact the police, which, he said, he had done. Manderson said that the father approached Manderson's truck and tried unsuccessfully to open the driver's side door, after which, Manderson said, the father returned to his own truck and left the parking lot.

7

2210282

According to Manderson, he drove back to a parking lot adjacent to the softball-practice field and parked in a manner that would allow him to observe the entrance to that parking lot. Manderson said that he did not observe the father return to the practice-field parking lot. Despite that fact, Manderson testified, the father had returned to the parking lot and approached him as he sat in his truck. Manderson said that the father screamed profanities and attempted to hit Manderson in the face. Manderson said that the father's fist only grazed him but that the father also grabbed and tore the shirt Manderson was wearing. Manderson said that persons returning from the practice field witnessed the altercation, which, Manderson said, ended when he drove his truck forward and the father jumped clear of the truck. Manderson pressed criminal charges against the father based on that incident.

Regarding the October 2019 incident, Manderson testified that he was driving from property that he owned on a road upon which the father's house was located; Manderson said that his two-year-old daughter was in his truck with him. He said that he noticed the father's truck behind him and that he grew concerned. Manderson admitted that,

8

when the father attempted to pass his truck, Manderson sped up to speeds of approximately 80 miles per hour to prevent the father from passing him. According to Manderson, he observed the father point a gun out of his window and heard the father fire that gun three times. Manderson testified that he called the mother and then called 911 to report the father's behavior. Manderson said that, after some time, the father was able to pass him and that the father had then stopped his truck on the roadway. Manderson said that he executed a three-point turn and proceeded to return the way he had come to avoid the father. Ultimately, Manderson said, he and the father later passed each other as they headed in opposite directions, and, Manderson testified, the father's truck damaged the side mirror of Manderson's truck. Manderson testified that he had sworn out an arrest warrant for the father.

The mother testified at the November 2019 hearing that the father had violated the provision of the 2018 judgment requiring him to remain more than 100 feet from Manderson because, she testified, the father had attended a softball game of one of the children in April 2019. She admitted that the father and Manderson had not spoken to each other

9

and that nothing had happened during or after the game. The mother also testified at the November 2019 hearing that she had felt threatened by the father and that the children were "petrified" of the father. She admitted, however, that the children loved the father and wanted a relationship with the father. She then specifically explained that the children were "petrified" that the father would hurt someone in their family. At the June 2020 hearing, the mother testified that she could not identify any danger that the father posed to the children. She also testified that the children appeared to blame Manderson for the problems between the adults.

The mother testified at the December 2020 trial that she desired a "regular" or "set" visitation schedule so that the children would know when they would be visiting the father. She also testified that she desired for the father, who is an electrician, to work in the local area instead of out of town because his work schedule had been difficult to work around. Although the mother testified that she did not believe that the father "would physically, intentionally hurt [the children] at all, not intentionally," she said that she believed that the father emotionally

abuses and manipulates them. The mother did not elaborate on the alleged emotional abuse of the children by the father.

At the June 2020 hearing, the father testified that he had completed an anger-management course as required by the trial court in the November 2019 pendente lite order. According to the father, although he did not believe that he had an anger-management problem, he had learned from the class to "walk away and not to pursue someone in a harmful way." He said that he had been visiting the children and that his visitations had been supervised by the mother's former stepmother. He indicated that he had suggested other supervisors to the mother but that she had not agreed to those persons. He also explained that he worked in Augusta, Georgia, and that he worked every day except for Sundays. The father testified that the mother had not been willing to cooperate with his work schedule in setting up visitations.

At the December 2020 trial, the father testified that he had been able to exercise only minimal visitation because of issues with the availability of the current visitation supervisor, Christopher Statin; his own work schedule; or the children's extracurricular activities. He

11

commented that neither the mother nor the guardian ad litem had been willing to approve alternate supervisors to facilitate more visitation. He testified that he loved the children and that he wanted to resume normal visitation with them.

Sloane Fitzgerald, a therapist with East Alabama Mental Health, testified at the June 2020 hearing that she had counseled the younger child between November 2019 and February 2020. Fitzgerald said that the younger child had described her relationship with the father as "good" and had said that she missed the father. Fitzgerald also testified that the younger child had shared in her sessions that Manderson made her uncomfortable, that she was concerned about Manderson's drinking, and that she did not like it when Manderson tickled her.

The younger child, who was then 12 years old, testified at the June 2020 hearing that she wanted to resume regular visits with the father. She said that she did not feel that she was in any danger from the father. The younger child complained that Manderson tickled her and that, despite her having told him that she did not like to be tickled, he had recently resumed doing so. She described Manderson as being "in

charge" and said that she was aware that Manderson did not like the father. She also commented that Manderson drinks "throughout the day."

The older child, K.L. ("the older child"), who was then 14 years old, testified at the June 2020 hearing, as well. Like the younger child, the older child testified that she had a good relationship with the father and that the father had not done anything that had made her scared of him. She said that she wanted to spend a normal weekend with the father. She described the relationship between the mother and Manderson as "in between" good and bad, and she indicated that the mother and Manderson argued and that Manderson would sometimes "get in [the mother's] face." The older child also said that, when the father had been quite ill in the hospital, Manderson had become angry when she had asked to call or visit the father. According to the older child, she was aware that Manderson was prohibited from drinking around the children but, she said, he did so anyway; she also said that his drinking bothered her.

Christopher Statin, the approved visitation supervisor, testified that he had agreed to assist with supervising visitations between the father and the children but that, when he had agreed to do so, he had understood that he would be one of several supervisors. He said that he had informed the guardian ad litem that he worked every other Saturday and that he would therefore not always be available to supervise visits for the father. He said that he was surprised to see that he was the only named supervisor in the trial court's June 2020 order. According to Statin, he had been available to supervise only two visits between the entry of the June 2020 order and the December 2020 trial. He testified that those visits had gone well and said that the children had enjoyed being around the father.

On appeal, the father first challenges the trial court's contempt findings and the associated imposition of $2,000 in fines and the award of attorney fees. First, the father contends that the trial court must have found him in criminal contempt, which, he says, is not supported by the evidence. Within that argument, the father also briefly asserts that, even if the trial court found him in civil contempt, that finding is not supported

by clear and convincing evidence. Secondly, the father argues that the $2,000 in fines imposed by the trial court exceeds the statutory limit of $100 per incident of criminal contempt prescribed by Ala. Code 1975, § 12-11-30(5). Finally, the father complains that the trial court could not have awarded attorney fees based on its findings of contempt.

As noted, the trial court specifically stated that it was holding the father in <u>civil</u> contempt and explained that it had imposed the $1,000 fine for each incident of contempt as a means of coercing the father's future compliance with the provisions of the 2018 judgment and any subsequent judgment prohibiting him from being in close proximity to, or having contact with, Manderson. The father argues that the contempt findings must be criminal in nature because the record lacks evidence "of a continuing failure or refusal to abide by the trial court's orders" and because the trial court imposed punitive fines, albeit, he asserts, ones in excess of the fines permitted under Alabama law, <u>see</u> § 12-11-30(5). We disagree.

We have previously explained that the distinction between a finding of criminal contempt and one of civil contempt is a fine one.

15

"Rule 70A(a)(2), Ala. R. Civ. P., provides, in pertinent part:

"'(C) "Criminal contempt" means ...

"'....

"'(ii) Willful disobedience or resistance of any person to a court's lawful writ, subpoena, process, order, rule, or command, where the dominant purpose of the finding of contempt is to punish the contemnor.

"'(D) "Civil contempt" means willful, continuing failure or refusal of any person to comply with a court's lawful writ, subpoena, process, order, rule, or command that by its nature is still capable of being complied with.'

"Criminal contempt imposes punishment for failure to obey a trial court's judgment or order, and a key element of a finding of criminal contempt pursuant to Rule 70A(a)(2)(C)(ii) is that such a finding is intended to 'punish the contemnor.' Sanctions for criminal contempt are statutorily limited to a maximum fine of $100 and imprisonment not to exceed five days. § 12-11-30(5), Ala. Code 1975. A key element of a finding of civil contempt is that such a finding is intended to compel compliance, and sanctions for civil contempt may exceed the limits provided by § 12-11-30(5) and 'may continue indefinitely until the contemnor performs as ordered.' Pate v. Guy, 934 So. 2d 1070, 1072 (Ala. Civ. App. 2005); see also Kalupa v. Kalupa, 527 So. 2d 1313, 1317 (Ala. Civ. App. 1988) (citing Charles Mfg. Co. v. United Furniture Workers, 361 So. 2d 1033 (Ala. 1978)).

"… In <u>Lightsey v. Kensington Mortgage & Finance Corp.</u>, 294 Ala. 281, 315 So. 2d 431 (1975), our supreme court explained that contempt can have elements of both civil and criminal contempt and be treated as civil contempt.

"'One of the most quoted cases on this subject is <u>Gompers v. Bucks Stove & Range Co.</u>, 221 U.S. 418, 31 S. Ct. 492, 55 L. Ed. 797 [(1911)], where it was said:

"'"Contempts are neither wholly civil nor altogether criminal. And 'it may not always be easy to classify a particular act as belonging to either one of these two classes. It may partake of the characteristics of both.' <u>Bessette v. W.B. Conkey Co.</u>, 194 U.S. 324, 24 S. Ct. 665, 48 L. Ed. [997 (1904)]. But in either event, and whether the proceedings be civil or criminal, there must be an allegation that in contempt of court the defendant has disobeyed the order, and a prayer that he be attached and punished therefor. It is not the fact of punishment, but rather its character and purpose, that often serve to distinguish between the two classes of cases. If it is for civil contempt the punishment is remedial, and for the benefit of the complainant. But if it is for criminal contempt the sentence is punitive, to vindicate the authority of the court. It is true that punishment by imprisonment may be remedial as well as punitive, and many

civil contempt proceedings have resulted not only in the imposition of a fine, payable to the complainant, but also in committing the defendant to prison. But imprisonment for civil contempt is ordered where the defendant has refused to do an affirmative act required by the provisions of an order which, either in form or substance, was mandatory in its character. Imprisonment in such cases is not inflicted as a punishment, but is intended to be remedial by coercing the defendant to do what he had refused to do. The decree in such cases is that the defendant stand committed unless and until he performs the affirmative act required by the court's order."'

"Lightsey, 294 Ala. at 285-86, 315 So. 2d at 434-35; see also Fludd v. Gibbs, 817 So. 2d 711, 714 (Ala. Civ. App. 2001), and Norland [v. Tanner], 563 So. 2d [1055,] 1057-58 [(Ala. Civ. App. 1990)]."

J.S. v. L.M., 251 So. 3d 61, 66-67 (Ala. Civ. App. 2017).

The trial court stated clearly in its May 5, 2021, order that it had found the father to be in civil contempt and that its purpose in imposing the $1,000 fine per incident of contempt was to coerce future compliance with the provisions of the 2018 judgment and any subsequent judgment

prohibiting close contact or communication between the father and Manderson. Although the trial court imposed significant fines, that fact alone does not compel the conclusion that the trial court found the father to be in criminal contempt. As the trial court stated in its May 5, 2021, order, a trial court may impose a monetary sanction based on a finding of civil contempt, either as a method of coercing future compliance with court orders or as a method of compensating the complainant for losses resulting from the contemptuous actions of the contemnor. See United States v. United Mine Workers of Am., 330 U.S. at 303-04; Lightsey v. Kensington Mortg. & Fin. Corp., 294 Ala. 281, 287, 315 So. 2d 431, 436 (1975); and Chestang v. Chestang, 769 So. 2d at 298 (awarding damages to compensate the complainant for losses incurred as a result of the contemnor's actions). We therefore conclude that the trial court held the father in civil contempt.

Insofar as the father contends that the record lacks clear and convincing evidence to support the trial court's findings of two incidents of contempt, we reject that argument. "[A] finding of civil contempt must be supported by clear and convincing evidence." Kizale v. Kizale, 254 So.

3d 233, 238 n.3 (Ala. Civ. App. 2017); see also Marshall v. Marshall, 346 So. 3d 1008, 1021 (Ala. Civ. App. 2021).

> "Clear and convincing evidence is
>
> "'"[e]vidence that, when weighed against evidence in opposition, will produce in the mind of the trier of fact a firm conviction as to each essential element of the claim and a high probability as to the correctness of the conclusion. Proof by clear and convincing evidence requires a level of proof greater than a preponderance of the evidence or the substantial weight of the evidence, but less than beyond a reasonable doubt.'"'

Dyess v. Dyess, 94 So. 3d 384, 386-87 (Ala. Civ. App. 2012) (quoting L.M. v. D.D.F., 840 So. 2d 171, 179 (Ala. Civ. App. 2002), quoting in turn Ala. Code 1975, § 6-11-20(b)(4)).

Manderson testified about both incidents of contempt. His testimony is sufficiently clear and convincing to support the conclusion that the father violated the provisions of the 2018 judgment and subsequent orders prohibiting the father from being in close proximity to Manderson or from engaging in direct or indirect contact with Manderson by approaching Manderson's vehicle and attempting to commit battery and by purposefully chasing Manderson's vehicle down a road and

attempting to force a confrontation between them. The father's decision to invoke his privilege against self-incrimination, while protected, is also support for the conclusion that the incidents described by Manderson occurred, because the invocation of the right against self-incrimination may form the basis of an adverse inference against the party invoking the privilege. Rule 512A(a), Ala. R. Evid. ("In a civil action or proceeding, a party's claim of a privilege, whether in the present action or proceeding or upon a prior occasion, is a proper subject of comment by judge or counsel. An appropriate inference may be drawn from the claim."); see Ex parte Ebbers, 871 So. 2d 776, 795 (Ala. 2003) (explaining that, if a party in a civil action invoked the privilege against self-incrimination and refused to answer deposition questions, "the jury … could be instructed at trial that an adverse inference could be drawn against him as a result"). Accordingly, we affirm the trial court's judgment insofar as it found the father to be in civil contempt.

As mentioned above, the trial court's imposition of $2,000 in fines does not necessarily compel the conclusion that the trial court determined that the father was in criminal contempt, because a trial

court may impose a monetary fine as a judicial sanction for civil contempt. See United Mine Workers of Am., 330 U.S. at 303-04; Lightsey, 294 Ala. at 287, 315 So. 2d at 436. When imposing a fine for civil contempt as a method for coercing future compliance with a trial court's orders, however, a trial court must provide a method by which the contemnor may avoid the fine through such future compliance. International Union, Mine Workers of Am. v. Bagwell, 512 U.S. 821 (1994). The United States Supreme Court has explained:

> "A contempt fine accordingly is considered civil and remedial if it either 'coerce[s] the defendant into compliance with the court's order, [or] ... compensate[s] the complainant for losses sustained.' United States v. Mine Workers, 330 U.S. 258, 303-304 (1947). Where a fine is not compensatory, it is civil only if the contemnor is afforded an opportunity to purge. See Penfield Co. of Cal. v. SEC, 330 U.S. 585, 590 (1947). Thus, a 'flat, unconditional fine' totaling even as little as $50 announced after a finding of contempt is criminal if the contemnor has no subsequent opportunity to reduce or avoid the fine through compliance. Id., at 588."

Bagwell, 512 U.S. at 829.

The trial court's imposition of a $1,000 fine for each incident of contempt is not an appropriate fine for civil contempt because the fine is a "'flat, unconditional fine.'" Bagwell, 512 U.S. at 829 (quoting Penfield

22

2210282

Co. of Cal. v. SEC, 330 U.S. 585, 588 (1947)).  We also note that the trial

court's announcement that future incidents of contempt by the father

would result in the imposition of a $1,000 fine per incident also appears

to be a criminal sanction as opposed to a prospective fine for future civil

contempt.  See Bagwell, 512 U.S. at 836-37.  We therefore reverse that

portion of the trial court's judgment imposing the $1,000 fine per incident

of contempt because the trial court lacked the authority to impose those

fines as a sanction for civil contempt.

Because we have concluded that the trial court found the father to

be in civil, as opposed to criminal, contempt, we reject the father's

argument that the trial court could not award attorney fees to the mother

based on the finding of criminal contempt.  See Ex parte Collins, 860 So.

2d 1259, 1260 (Ala. 2003) (explaining that an award of attorney fees is

not proper in a criminal-contempt action).  As our supreme court

explained in Moody v. State ex rel. Payne, 355 So. 2d 1116, 1119 (Ala.

1978):

> "As a general rule, and in the absence of contractual or
> statutory provisions, attorneys' fees are not recoverable either
> as costs of litigation or as an element of damages. State v.

23

Alabama Public Service Commission, 293 Ala. 553, 307 So. 2d 521 (1975); Hartford Accident & Indemnity Co. v. Cosby, 277 Ala. 596, 173 So. 2d 585 (1965); and Taylor v. White, 237 Ala. 630, 188 So. 232 (1939). There are, however, a number of exceptions to this general rule. One widely-accepted exception, and one which we specifically accept, is that in proper circumstances a reasonable attorney's fee may be allowed the prevailing prosecuting party in a civil contempt proceeding. This award, though not mandatory, is allowed within the sound discretion of the trial Court."

The father does not develop his argument or cite any authority indicating what evidence is required to support an award of attorney fees in a civil-contempt case. We have cautioned against such an approach in the past.

"'Rule 28(a)(10)[, Ala. R. App. P.,] requires that arguments in briefs contain discussions of facts and relevant legal authorities that support the party's position. If they do not, the arguments are waived.' White Sands Grp., L.L.C. v. PRS II, LLC, 998 So. 2d 1042, 1058 (Ala. 2008); see also Bishop v. Robinson, 516 So. 2d 723, 724 (Ala. Civ. App. 1987) (quoting Thoman Eng'g, Inc. v. McDonald, 57 Ala. App. 287, 290, 328 So. 2d 293, 294 (Civ. App. 1976)) (noting that an appellant should 'present his issues "with clarity and without ambiguity"' and 'fully express his position on the enumerated issues' in the argument section of his brief); accord United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ('It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones.')."

24

Hudson v. Hudson, 178 So. 3d 861, 865 (Ala. Civ. App. 2014). Accordingly, the father's argument on this issue is waived.

The father next complains that the trial court failed to apply the doctrine of unclean hands to prevent the mother from asserting her rights under the divorce judgment and any subsequent judgment, including the 2018 judgment. The father apparently contends that, because the mother and Manderson admitted that they had violated certain provisions of the 2018 judgment, presumably by Manderson's consumption of alcohol during the mother's custodial periods and his alleged disciplining of the children, the mother should not have been permitted to pursue her contempt claims.

> "'The purpose of the clean hands doctrine is to prevent a party from asserting his, her, or its rights under the law when the party's own wrongful conduct renders the assertion of such legal rights "contrary to equity and good conscience."' J & M Bail Bonding Co. v. Hayes, 748 So. 2d 198, 199 (Ala. 1999) (quoting Draughon v. General Fin. Credit Corp., 362 So. 2d 880, 884 (Ala. 1978)). It is well settled that the decision whether to apply the clean-hands doctrine is within the sound discretion of the trial court. Borcicky v. Borcicky, 763 So. 2d 265 (Ala. Civ. App. 2000); Grant v. Smith, 661 So. 2d 752 (Ala. Civ. App. 1994). See also Fitzhugh v. Fitzhugh, 634 So. 2d 565 (Ala. Civ. App. 1994) (trial court's failure to apply the clean-hands doctrine was not an abuse of

discretion in a custody-modification case); Holman v. Holman, 612 So. 2d 492 (Ala. Civ. App. 1992) (affirming the trial court's decision to allow a husband who was under a contempt finding for his failure to pay child support to bring an action seeking to have the wife held in contempt related to the enforcement of a property-division provision of the parties' divorce judgment)."

Burkett v. Gresham, 888 So. 2d 505, 509 (Ala. Civ. App. 2004).

The mother's contempt petition was premised, initially, on the father's attempted battery on Manderson; she later amended the petition to include the allegation that the father had engaged in the incident on the road in October 2019. The father does not explain how the fact that Manderson might have violated the provisions of the 2018 judgment by drinking alcohol during a custodial period or by imposing discipline on the children would render the mother's contempt petition "'contrary to equity and good conscience.'" Burkett, 888 So. 2d at 884 (quoting J & M Bail Bonding Co., 748 So. 2d at 199). In fact, other than quoting the general principles contained in Burkett, as quoted above, the father merely states that the mother is in contempt of the same judgment upon which her contempt claims are based. See Hudson, 178 So. 3d at 865; see also Rule 28(a)(10), Ala. R. App. P.; White Sands Grp., L.L.C. v. PRS II,

2210282

LLC, 998 So. 2d 1042, 1058 (Ala. 2008) ("Rule 28(a)(10)[, Ala. R. App. P.,] requires that arguments in briefs contain discussions of facts and relevant legal authorities that support the party's position. If they do not, the arguments are waived.").

We will not construct an argument relating to the clean-hands doctrine for the father. Spradlin v. Spradlin, 601 So. 2d 76, 79 (Ala. 1992) (explaining that an appellate court is not required to do a party's legal research or to develop an argument on behalf of a party); Hudson, 178 So. 3d at 865. Additionally, application of that doctrine rests in the discretion of the trial court, Burkett, 888 So. 2d at 509, and we see no abuse of the trial court's discretion in this case. Furthermore, we note that the trial court did not hold the mother in contempt, as the father had requested, and the father has not appealed from that aspect of the judgment.

The father next challenges the trial court's judgment insofar as it modified the visitation provisions of the divorce judgment and any subsequent judgment to allow the father to visit with the children only on the second and fourth Saturdays of each month from 9:00 a.m. to 6:00

p.m. He contends that he does not pose a danger to the children and that the children are not frightened of him and desire to visit with him.

> "This court has held that a noncustodial parent's visitation rights may be restricted '"in order to protect children from conduct, conditions, or circumstances surrounding their noncustodial parent that endanger the children's health, safety, or well-being."' B.F.G. v. C.N.L., 204 So. 3d 399, 404 (Ala. Civ. App. 2016) (quoting Pratt v. Pratt, 56 So. 3d 638, 641 (Ala. Civ. App. 2010)). However, a restriction on a noncustodial parent's visitation must not '"do[] more than necessary to protect the children."' Id. See also Norrell v. Norrell, 473 So. 2d 523, 525 (Ala. Civ. App. 1985) ('When justified and supported by the evidence or reasonable inferences therefrom, a trial court cannot be faulted in visitation matters for being reasonably careful in establishing restrictions upon the visitation rights of a parent so as to attempt to assure a young child's safety and welfare.')."

Wells v. Tankersley, 244 So. 3d 975, 984 (Ala. Civ. App. 2017). Although a trial court has broad discretion over the issue of visitation, a noncustodial parent should be given the opportunity to maintain a meaningful relationship with his or her child. Carr v. Broyles, 652 So. 2d 299, 303, 304 (Ala. Civ. App. 1994).

The evidence indicates that the father might pose a danger to Manderson and that he has certainly exercised extremely poor judgment

when managing his apparent dislike of Manderson. However, no evidence indicates that the children were present during either incident of contempt. Because the trial court's modified visitation award permits the father to exercise unsupervised visitation for several hours at a time, we presume that the trial court concluded that the father did not pose such an extreme risk to the children's safety that supervision of the father during his periods of visitation was necessary. In light of the award of unsupervised visitation, we cannot discern why the trial court modified the father's visitation to preclude overnight visitation and to provide no extended summer or holiday visitation when no evidence indicated that overnight visitation posed a peculiar danger to the children. We have previously explained that, "if a … judgment is modified to limit a parent's visitation based on misconduct, the limitation ordered must be supported by evidence that the misconduct of the parent is detrimental to the child." Carr, 652 So. 2d at 304. Although we do not hold that a trial court cannot place limits on a parent's visitation unless the children involved have first suffered harm a result of the parent's misconduct, the record must disclose that the limitations imposed on a

parent's visitation are to protect the children from anticipated harm resulting from the noncustodial parent's behavior. In this instance, because the mother testified that she did not believe that the father would intentionally cause physical harm to the children, the children testified that they had no fear of the father and strongly desired to resume normal visitation with him, and no evidence indicates that the father's misconduct was directed at or occurred in the presence of the children, we cannot conclude that the trial court's limited visitation award is supported by the evidence. Accordingly, we reverse the trial court's judgment insofar as it modified the father's visitation.

Finally, the father argues that the trial court erred in requiring him to pay $3,700 toward the guardian ad litem's fee. He specifically complains that the trial court failed to conduct an "audit" of the guardian ad litem's fee statements and, relying on Van Schaack v. AmSouth Bank, N.A., 530 So. 2d 740, 750 (Ala. 1988), contends that the trial court should have conducted a hearing on the guardian ad litem's fee request. We begin by noting that "'[t]he matter of the guardian ad litem's fee is within the discretion of the trial court, subject to correction only for abuse of

discretion .'" <u>Townsend v. Hogan</u>, 73 So. 3d 702, 706 (Ala. Civ. App. 2011) (quoting <u>Englund v. First Nat'l Bank of Birmingham</u>, 381 So. 2d 8, 12 (Ala. 1980)).

In <u>Van Schaack</u>, our supreme court reversed the award of a guardian ad litem's fee and remanded the cause for a hearing on that fee, noting that

> "the record discloses no evidence regarding the services performed by the guardian ad litem other than his presence at the July 21, 1986, hearing on the Bank's petition for final settlement, at which he asked several questions of [a witness]. However, there was no testimony offered at that hearing concerning the services the guardian ad litem had performed, nor does the trial court's order refer to the nature or character of the services performed by the guardian ad litem."

530 So. 2d at 750. In contrast, in the present case, the record contains two itemized bills presented by the guardian ad litem setting out the tasks she conducted and the amount due for each task. Because the record in the present case contains evidence indicating the tasks performed by the guardian ad litem and the fees incurred for her services, we do not agree with the father that <u>Van Schaack</u> compels reversal of the guardian ad litem's fee in the present case. In fact, we have affirmed the

award of a guardian ad litem's fee based on an itemized bill. Roberts v. Roberts, 189 So. 3d 79, 85 (Ala. Civ. App. 2015).

Insofar as the father complains that the guardian ad litem "literally paid a witness that had nothing to do with the minor children to testify in support of the [mother's] contempt petition," we are disinclined to reverse the award of the guardian ad litem's fee on that basis. The father provides no authority providing that the guardian ad litem is not authorized to subpoena or pay witness fees to a witness that the guardian ad litem believes will present relevant testimony. See Hudson, 178 So. 3d at 865.; Rule 28(a)(10) (requiring an appellant to present applicable legal authority in his or her brief on appeal); see also Rogers v. Rogers, 307 So. 3d 578, 590 (Ala. Civ. App. 2019) (indicating that a guardian ad litem "may participate in the litigation through activities associated with the role of an attorney, such as examining witnesses and presenting arguments to the court in the same manner as counsel for a parent"). We therefore affirm the trial court's judgment insofar as it required the father to pay $3,700 of the guardian ad litem's fee.

In conclusion, we reverse the trial court's judgment insofar as it modified the father's visitation and insofar as it imposed $2,000 in fines based on the conclusion that the father was in civil contempt, and we remand the cause for entry of a judgment consistent with this opinion. We affirm all other aspects of the trial court's judgment.

AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.

Thompson, P.J., and Hanson and Fridy, JJ., concur.

Moore, J., concurs in the result, without opinion.